**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

MARSHA PALMER
9134 Maple Street
Stoutsville, Ohio 43154,

Plaintiff,

v.

EMBASSY WINCHESTER, LLC
36 Lehman Drive
Canal Winchester, Ohio 43110

**Serve Also:**
Embassy Winchester, LLC
c/o Nicholas F. Ciccone, Esq.
25201 Chagrin Blvd., Suite 190
Beachwood, Ohio 44122

Defendant.

CASE NO.

JUDGE:

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**JURY DEMAND ENDORSED HEREIN**

Plaintiff, Marsha Palmer, by and through undersigned counsel, as her Complaint against Defendant Embassy Winchester, LLC ("Embassy"), states and avers the following:

**PARTIES AND VENUE**

1. Palmer is a resident of the village of Stoutsville, Fairfield County, Ohio.
2. At all times herein, Palmer was acting in the course and scope of her employment.
3. Embassy is a domestic corporation that does business at 36 Lehman Drive, Canal Winchester, Franklin County, Ohio 43110 ("Canal Winchester Location").
4. Embassy is a "person or government entity" within the meaning of R.C. § 3721.24.
5. Embassy is an employer within the meaning of R.C. § 4101.11.

6. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Palmer is alleging a Federal Law Claim under the Families First Coronavirus Response Act ("FFCRA"), Pub. L No 116-117, 134 Stat. 178 (2020).

7. All material events alleged in this Complaint occurred in Franklin County, Ohio.

8. This Court has supplemental jurisdiction over Palmer's state law claims pursuant to 28 U.S.C. § 1367 as Palmer's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**FACTS**

10. Palmer is a former employee of Embassy.

11. On or about February 17, 2020, Palmer began working for Embassy.

12. Embassy employed Palmer as a dietary manager.

13. Embassy is a residential facility that provides skilled nursing.

14. Embassy has 176 beds.

15. Embassy has care units for short-term and long-term services and memory care.

16. Embassy is a nursing home.

17. Embassy provides accommodations for 17 or more unrelated individuals and supervision and personal care services for three or more of those individuals who are dependent on the services of others by reason of age or physical or mental impairment.

18. Embassy provides accommodations for three or more unrelated individuals, supervision and personal care services for at least three of those individuals who are dependent on the services of others by reason of age or physical or mental impairment, and, to at least one of those individuals, skilled nursing care.

19. At all times herein, Embassy had fewer than 500 employees.
20. On or about February 18, 2020, Palmer made a report to Marie Hooper ("First Report").
21. Hooper is an Embassy administrator.
22. In the First Report, Palmer told Hooper that there were several repairs needed at Embassy ("Repairs").
23. Among the needed Repairs, there were broken tiles in the kitchen.
24. Among the needed Repairs, there were leaking sinks.
25. Among the needed Repairs, the seals on the refrigerator and freezer needed to be replaced.
26. Among the needed Repairs, sewage backed up into the kitchen.
27. In the First Report, Palmer reported that, without Repairs, there would be a hazard to the safety of employees.
28. In the First Report, Palmer reported that, without Repairs, there would be a hazard to the safety of residents.
29. In the First Report, Palmer reported that, without Repairs, there would be a hazard to the safety of visitors.
30. In the First Report, Palmer reported that she discovered black mold in the kitchen at Embassy.
31. Black mold is a potential hazard to human health.
32. In response to the First Report, Embassy did not make the Repairs.
33. In response to the First Report, Embassy did not eliminate the black mold.
34. Palmer believed that Embassy's neglect of the Repairs created a hazard to residents.
35. Palmer believed that Embassy's neglect of the black mold created a hazard to residents.
36. In good faith, Palmer made or caused to be made a report of suspected abuse, neglect, or exploitation of a resident or misappropriation of the property of a resident.

37. It was reasonable for Palmer to believe that Embassy's actions constituted abuse, neglect, or exploitation of a resident.
38. Palmer engaged in protected activity within the meaning of R.C. § 3721.24.
39. The staff at Embassy regularly had morning meetings.
40. During several morning meetings, Palmer brought up the Repairs and the black mold ("Subsequent Reports").
41. In response to the Subsequent Reports, Embassy did not make the Repairs.
42. In response to the Subsequent Reports, Embassy did not eliminate the black mold.
43. Palmer believed that Embassy's neglect of the Repairs created a hazard to residents.
44. Palmer believed that Embassy's neglect of the black mold created a hazard to residents.
45. In good faith, Palmer made or caused to be made a report of suspected abuse, neglect, or exploitation of a resident or misappropriation of the property of a resident.
46. It was reasonable for Palmer to believe that Embassy's actions constituted abuse, neglect, or exploitation of a resident.
47. Palmer engaged in protected activity within the meaning of R.C. § 3721.24.
48. Palmer cleaned the kitchen on her own, to try and minimize the amount of mold.
49. On or about May 7, 2020, Palmer tested positive for COVID-19.
50. On or about May 7, 2020, Palmer spoke with Hooper, Human Resources Representative Angela Thaxton, and Vice President of Operations Karen Lawson via phone ("May 7 Call").
51. In the May 7 Call, Palmer informed Embassy that she tested positive for COVID-19.
52. In the May 7 Call, Hooper, Lawson, and Thaxton asked Palmer to provide a doctor's note confirming her diagnosis.
53. In the May 7 Call, Palmer requested leave due to her COVID-19.

54. In the May 7 Call, Palmer asked what she needed to do to ensure that she received paid leave in accordance with FFCRA.

55. In the May 7 Call, Lawson told Palmer that the only way to receive pay for her leave was to apply for unemployment.

56. After the May 7 Call, Palmer's doctor sent Embassy a doctor's note.

57. On May 7, 2020, Palmer had worked for Embassy for more than 30 days.

58. On May 7, 2020, Palmer qualified for leave under FFCRA.

59. On May 7, 2020, Palmer qualified for paid leave under FFCRA.

60. On May 7, 2020, Palmer went on leave due to her COVID-19 ("COVID-19 Leave").

61. Embassy did not pay Palmer for her COVID-19 Leave.

62. While Palmer was on COVID-19 Leave, Palmer updated Thaxton daily about her medical condition.

63. While Palmer was on COVID-19 Leave, Palmer updated Thaxton at least once a week about her medical condition.

64. On or about June 3, 2020, Palmer spoke with Human Resources Representative Melissa (Last Name Unknown) ("June 3 Call").

65. In the June 3 Call, Melissa LNU informed Palmer that Palmer would not be permitted to return to work.

66. On or about June 3, 2020, Embassy terminated Palmer's employment ("Termination").

67. In the June 3 Call, Melissa LNU alleged that the reason for the Termination was job abandonment.

68. In the June 3 Call, Melissa LNU told Palmer that Embassy replaced Palmer.

69. Palmer did not abandon her job.

70. Palmer did not resign from her job.

71. Embassy has a progressive disciplinary policy ("Discipline Policy").

72. A verbal warning is the lowest level of discipline in the Discipline Policy.

73. Palmer did not receive a verbal warning before the Termination.

74. A written warning is a higher level of discipline than a verbal warning in the Discipline Policy.

75. Palmer did not receive a written warning before the Termination.

76. A termination is the highest level of discipline in the Discipline Policy.

77. Embassy knowingly skipped progressive disciplinary steps in terminating Palmer.

78. Embassy knowingly terminated Palmer's employment.

79. Embassy knowingly took an adverse employment action against Palmer.

80. Embassy knowingly took an adverse action against Palmer.

81. Embassy intentionally skipped progressive disciplinary steps in terminating Palmer.

82. Embassy intentionally terminated Palmer's employment.

83. Embassy intentionally took an adverse employment action against Palmer.

84. Embassy intentionally took an adverse action against Palmer.

85. Embassy knew that skipping progressive disciplinary steps in terminating Palmer would cause Palmer harm, including economic harm.

86. Embassy knew that terminating Palmer would cause Palmer harm, including economic harm.

87. Embassy willfully skipped progressive disciplinary steps in terminating Palmer.

88. Embassy willfully terminated Palmer's employment.

89. Embassy willfully took an adverse employment action against Palmer.

90. Embassy willfully took an adverse action against Palmer.

91. On or about June 3, 2020, Embassy terminated Palmer's employment because she took COVID-19 Leave.

92. On or about June 3, 2020, Embassy terminated Palmer's employment based on her complaints of suspected abuse, neglect, or exploitation of a resident or misappropriation of the property of a resident.

93. On or about June 3, 2020, Embassy terminated Palmer's employment because she reported hazards to the safety of employees.

94. On or about June 3, 2020, Embassy terminated Palmer's employment because she reported hazards to the safety of frequenters.

95. As a direct and proximate result of Embassy's conduct, Palmer suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT I: VIOLATION OF FFCRA

96. Palmer restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

97. Embassy has fewer than 500 employees.

98. As of May 7, 2020, Palmer worked for Embassy for more than 30 days.

99. On or about May 7, 2020, Palmer had COVID-19.

100. On or about May 7, 2020, Palmer requested leave due to her COVID-19.

101. On or about May 7, 2020, Palmer qualified for paid leave under FFCRA.

102. Embassy did not pay Palmer for her COVID-19 Leave.

103. Embassy did not provide Palmer with the paid leave to which she was entitled.

104. On or about June 3, 2020, Embassy terminated Palmer's employment.

105. On or about June 3, 2020, Embassy terminated Palmer's employment because she took COVID-19 Leave.

106. As a direct and proximate result of Embassy's wrongful conduct, Palmer is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

**COUNT II: VIOLATION OF OHIO WHISTLEBLOWER STATUTE R.C. § 3721.24**

107. Palmer restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

108. Embassy is a nursing home.

109. Embassy provides accommodations for 17 or more unrelated individuals and supervision and personal care services for three or more of those individuals who are dependent on the services of others by reason of age or physical or mental impairment.

110. Embassy provides accommodations for three or more unrelated individuals, supervision and personal care services for at least three of those individuals who are dependent on the services of others by reason of age or physical or mental impairment, and, to at least one of those individuals, skilled nursing care.

111. Embassy is a "person or government entity" within the meaning of R.C. § 3721.24.

112. Palmer is a an "employee or other individual" within the meaning of R.C. § 3721.24.

113. During the relevant period, Palmer performed work or services for Embassy.

114. In good faith, Palmer made or caused to be made a report of suspected abuse, neglect, or exploitation of a resident or misappropriation of the property of a resident.

115. It was reasonable for Palmer to believe that Embassy's actions constituted abuse, neglect, or exploitation of a resident.

116. Palmer indicated an intention to make a report of suspected abuse, neglect, or exploitation of a resident or misappropriation of the property of a resident.

117. Palmer engaged in protected activity within the meaning of R.C. § 3721.24.

118. Embassy knew that Palmer engaged in protected activity within the meaning of R.C. § 3721.24.

119. Embassy retaliated against Palmer by terminating her employment based on her complaints of suspected abuse, neglect, or exploitation of a resident or misappropriation of the property of a resident.

120. Embassy's termination of Palmer followed closely in time to her protected activity.

121. Embassy's termination of Palmer was in violation of R.C. § 3721.24.

122. As a direct and proximate result of Embassy's conduct, Palmer suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**COUNT III: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

123. Palmer restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

124. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, including R.C. § 4101.11 *et seq.*, or in the common law, requiring employers to furnish a safe environment for employees and frequenters.

125. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law.

126. Embassy's termination of Palmer jeopardizes these public policies.

127. Embassy's termination of Palmer was motivated by conduct related to these public policies.

128. Embassy had no overriding business justification for terminating Palmer.

129. As a direct and proximate result of Embassy's conduct, Palmer has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Palmer respectfully requests that this Honorable Court grant the following relief:

(a) Issue an order requiring Embassy retroactively to restore Palmer to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against Embassy of compensatory and monetary damages to compensate Palmer for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against Embassy in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Palmer's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Paul Filippelli*_________
Trisha Breedlove (0095852)
Paul Filippelli (0097085)
**THE SPITZ LAW FIRM, LLC**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax: (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com
Email: paul.filippelli@spitzlawfirm.com
*Attorneys for Plaintiff Marsha Palmer*

**JURY DEMAND**

Plaintiff Palmer demands a trial by jury by the maximum number of jurors permitted.

*/s/ Paul Filippelli*_______
Trisha Breedlove (0095852)
Paul Filippelli (0097085)